UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

BILLIE JO BRITTON,

                         Plaintiff,

           -against-                                    5:06-CV-0639 (LEK)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                         Defendant.

---

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On January 1, 2002, Plaintiff Billie Jo Britton ("Plaintiff") filed an Application for

Disability Insurance Benefits ("DIB"), Childhood Disability Benefits ("CDB"), and

Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). Plaintiff's

Brief ("Pl. Br.") (Dkt. No. 9). In that Application, Plaintiff asserts that she has been disabled

since February 10, 2000. Administrative Record ("R.") at 94. The Commissioner of Social

Security ("the Commissioner") denied her benefits for lack of disability. Pl. Br. at 2.

Plaintiff now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C

§§ 405(g) and 1383(c)(3). Compl. (Dkt No. 1). Both parties have moved for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure 12(c). Dkt. Nos. 9 and 10. The Court

recognizes the challenges and struggles Plaintiff has encountered with mal-rotation of the gut,

hernia, acid reflux disease, and feelings of anxiety and depression. However, because the Court

must follow the requirements of 42 U.S.C. §§ 405(g) and 1383(c)(3) in reviewing final decisions

of the Commissioner of Social Security, it finds no proper basis for reversal or remand.

Therefore, for the reasons that follow, the Commissioner's determination of no disability is affirmed.

## II. BACKGROUND

### A. Procedural History

Plaintiff protectively filed an application for Disability Insurance Benefits, Childhood Disability, and Supplemental Security Income on January 1, 2002, alleging she has been disabled since February 10, 2000. R. 18, 94. That application was denied and Plaintiff timely requested an oral hearing, which subsequently took place on June 25, 2003, with Administrative Law Judge ("ALJ") Alfred R. Tyminski. R. 61, 621. After discussing the benefits of having counsel, Plaintiff, who was *pro se*, decided she would retain counsel, and the ALJ issued a second Notice of Hearing. R. 621-34.

The second hearing took place on September 2, 2003, also in front of ALJ Tyminski. R. 638. ALJ Tyminski issued a decision on December 8, 2003, in which he determined that Plaintiff was "not-disabled" under the Act. R. 15. On December 31, 2003, Plaintiff timely requested review of that decision to the Appeals Council, which ultimately denied review, and the ALJ's determination became the final decision of the Commissioner. R. 10, 13.

Plaintiff commenced this action on March 31, 2006. Dkt. No. 1. The Commissioner filed an Answer on November 8, 2006. Dkt. No. 5. Both parties have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). See Pl. Br.; Defendant's Brief (Dkt. No. 10).

### B. Plaintiff's History

Plaintiff was born on March 26, 1979, has a high school diploma, and was a full-time

nursing student for one year of college.  R. 639-40, 188.  She was twenty years old on the

alleged onset date, February 10, 2000, and twenty-four years old at the time of both her hearings;

she is now thirty-two.  Pl. Br. at 3; R. 94.  Plaintiff alleges disability due to complete mal-

rotation of the gut, hernia, and acid reflux disease which causes her abdominal pain, nausea, and

to feel lightheaded and dizzy.  Pl. Br. at 3; R. 123, 643.  Prior to her diagnosis, Plaintiff had "no

GI symptoms."  R. 266.

Plaintiff had been employed as a deli worker, cashier, and most recently an assembly line

worker starting in December 2002.  R. 27, 641.  She began working full time in April 2003, but

was terminated in July 2003, allegedly due to her failure to provide medical slips for recurring

absences.  R. 640-42.  Plaintiff claims her disability and the symptoms stemming from it have

inhibited her ability to gain and hold employment for long periods of time, which has hindered

her employment search.  R. 643.

### C. Medical Records

#### 1. Physical Impairment

On June 19, 1997, Plaintiff consulted with Associated Gastroenterologists for abdominal

pain and was seen by Dr. Alyn L. Adrian.  R. 264.  The examination revealed that Plaintiff's

"entire colon [was] oriented to the left abdomen . . . [which is] consistent with malrotation. . . ."

R. 265.  Plaintiff was referred to Dr. Michael H. Ratner due to "complete malrotation of the gut,"

and she had an on July 3, 1997.  R. 266-67.  On August 8, 1997, Plaintiff complained of a "sharp

pain" in her abdomen that was believed to be post-operative pain.  R. 269.  Plaintiff again went

to the emergency room on September 2, 1997 for pain, nausea, and vomiting, and was later

3

diagnosed with a "[p]artial small bowel obstruction due to adhesions." R. 273-74. This was surgically corrected during an exploratory laparotomy the following day, without any recorded complications. R. 276.

On December 8, 1997, Plaintiff again had similar symptoms and sought treatment, but now additionally had more severe pain and had not experienced a bowel movement for nine days. R. 278. Dr. Manoochehr Karjoo opined that Plaintiff's current problem was constipation and prescribed various laxatives to help alleviative her symptoms. R. 282. Exactly a year later, Plaintiff had abdominal pain all over and prescribed laxatives were no longer working. R. 289. An endoscopy, three biopsies, and pH probe test were performed; no complications were reported and lab results showed no significant pathological changes. R. 289, 291.

On January 28, 1999, Dr. Charles L. Yagoda examined Plaintiff's lower abdominal pain after her gastroenterologist suggested she may have "swollen ovaries." R. 351. Dr. Yagoda opined in his consultation on February 1, 1999 that Plaintiff did have multiple tiny cysts on both ovaries, but that it was "not consistent with [her] symptoms of abdominal pain." R. 352. Plaintiff began to see Dr. Robert R. Pavelock, a gastroentrologist and her Primary Care Physician ("PCP"). R. 371. On February 9, 1999, during their first consultation, he opined that she has an "apparent malrotation of the gut," and that he would treat it with medicine first before opting for surgery. R. 371.

On March 24, 1999, Dr. Pavelock conducted an esophagogastroduodenoscopy with a biopsy on Plaintiff and found "mild gastritis." R. 378. Additionally, Plaintiff has undergone multiple endoscopies and colonoscopies, all finding similar results. On October 6, 2000, Dr.

4

Philip Holtzapple evaluated Plaintiff, sought a follow-up in two-to-three weeks, and opined that "[e]xercise and employment would most likely benefit her." R. 429.

On December 15, 2000, Plaintiff was evaluated by Dr. James P. White, who found possible carpal tunnel syndrome in her right hand and ordered additional tests. R. 433. On January 3, 2001, Dr. White concluded that she had mild carpal tunnel syndrome with no significant muscular involvement. R. 434. Furthermore, Plaintiff underwent an orthopedic examination by Dr. Kalyani Ganesh on April 6, 2001, regarding her carpal tunnel, and lower back pain and arthritis in the ribs. R. 440. An x-ray conducted that day provided evidence that Plaintiff had narrowing at L4-5 and L5-S1. R. 443-44.

Dr. P. Sebastian Thomas evaluated Plaintiff's tail bone pain on August 16, 2001, and diagnosed her with Coccydynia. R. 505-06. Plaintiff underwent a coccygeal block procedure on August 30, 2001, and had "positive relief, with pain at 1/10 on the numeric analog scale." R. 509. On September 13, 2001, Dr. Amar N. Goyal followed up with Plaintiff and found a positive and good response. R. 511. A second procedure was performed on October 2, 2001, and a third two days later on October 4. R. 513-14. Dr. Parag Pandya submitted a follow-up report on November 1, 2001, stating that Plaintiff "says that pain is significantly better, but she still has some amount of pain." R. 515.

In Dr. Pavelock's consultation notes on December 28, 2001, he notes that Plaintiff has "much improved" after adding Reglan 5 mg to her treatment, and further that, her "occasional abdominal pain [is also] much improved." T. 473. Despite the improvement, in Dr. Pavelock's end impression and plan, he noted that "[w]e need to watch her very close [sic]." R. 473.

5

Plaintiff began physical therapy on February 21, 2002, and had an initial consultation with physical therapist ("PT") Christopher Doe. R. 524. PT Doe and PT Scott A. Miller saw Plaintiff over approximately nine weeks and kept notes indicating Plaintiff's progression. Plaintiff routinely performed various exercises including, *inter alia*, the recumbent bicycle, trunk rotations, body weight squats, seated rows, leg press, lat pull-downs, abdominal curls, back extensions. R. 525-26, 528, 530, 536, 543. Session assessments noted six times that "minimal complaints of pain and difficulty," R. 526, 528, 532, 534, 536, 543, and six times that sessions were "without complaints of pain or difficulty." R. 530, 538, 545, 547, 549, 551.        **2. Emotional Impairment**

Plaintiff alleges a psychiatric impairment beginning in 1997 following her abdominal surgeries. R. 436. Plaintiff denies that she had psychiatric treatment prior to 2001, but she does report being hospitalized at age 15 in a psychiatric unit after taking an overdose of her parent's medication. R. 436. Plaintiff underwent a psychological evaluation with Dr. Jeanne Shapiro on February 1, 2000. R. 405. Dr. Shapiro opined that "there does not appear to be any significant psychological symptomatology that would negatively impinge upon her ability to work." R. 405. Further, Dr. Shapiro noted that her symptoms of depression are "mild in nature," and that "Plaintiff would still be able to attend, understand, and follow directions, complete work-related tasks, appropriately interact with others in the work environment, and deal with stress." R. 405-06.

Dr. Shapiro reevaluated the Plaintiff on April 6, 2001, and echoed her prior conclusion that there are no negative impingements on Plaintiff's ability to work, and additionally, that "the

results of the examination are not consistent with the allegations." R. 448-49. Two weeks later

on April 19, 2001, Plaintiff had a psychiatric review technique completed by Dr. A. Hameid,

who marked that she had "No Medically Determinable Impairment." R. 450.

After an intake evaluation on March 21, 2001, Plaintiff was initially diagnosed with a

depressive disorder. R. 435. James Carroll, a licensed social worker for a state agency, began

meeting with the Plaintiff in April 2001; during this time Plaintiff was attending college to

become a registered nurse. R. 478. She received counseling from April 2001 to February 2001,

during which her primary concern was family problems and health care concerns were

secondary. R. 474-504. Mr. Carroll noted on May 25, 2001, that Plaintiff was having "difficulty

sleeping and feeling depressed," and also that she "discussed [her] anxiety regarding going back

to school." R. 486. On June 21, 2001 he also noted that she "continues to be depressed," but

also that "she is doing well in school." R. 487.

On July 7, 2001, Plaintiff underwent a psychiatric evaluation performed by Dr. K.G.A.

Kamath, a state agency physician, who noted that the Plaintiff "sometimes feels nervous, [and]

feels depressed all the time." R. 490. Dr. Kamath noted that Plaintiff's "[i]nsight is rather

superficial and judgement is fair," and submitted an Axis I diagnosis of Depressive Disorder. R.

490. Plaintiff was seen for a followup on August 7, 2001, and Dr. Kamath noted that "[h]er

depression is a little less" and that the "[m]edications are helping her." R. 492.

Mr. Carroll's progress notes, dated August 9, 2001, state that Plaintiff "does not appear

to be depressed at this time . . . [and she is] hopeful about school." R. 495. Notes dated August

11, 2001 recorded that Plaintiff was "progressing well with her depression" and that she had "a

brighter outlook." R. 493. However, on November 11, 2001, Carroll's notes indicate that

Plaintiff's "pain is getting worse and she finds it harder to do schoolwork." R. 494. Further, he

noted that Plaintiff "finds it harder to remain positive." R. 494. Additionally, three days later,

he recorded that Plaintiff mentioned that "her physical health and her ability to cope are

suffering," but that she "hopes that she will finish school and be successful as a nurse." R. 496.

Later, on November 28, 2001, the notes state that Plaintiff "reports that she is hardly able to

make it to school and lacks motivation due to intense physical pain" and that she "feels very

hopeless." R. 496.

Elaine Romaus, a licensed social worker for a state agency, began to see Plaintiff on

January 2, 2002. R. 496. The record indicates that Plaintiff dropped out of school due to pain,

that she was not sleeping well, and felt depressed. R. 496. A treatment plan completed on

March 1, 2002 noted that Plaintiff had interrupted sleep, decreased appetite, low energy, loss of

interest in usual activities, weight loss, tearfulness, and explosive behaviors at times. R. 499-

500.

### D. Medical Assessments

Dr. Richard Finley completed a physical Residual Functioning Capacity ("RFC") for

Plaintiff on March 3, 1999, where he opined there were no limitations established for any areas.

R. 292-99. Dr. Finley further noted Dr. Karjoo's finding that Plaintiff's "problem is

constipation," and added that she suffers from bile reflux, but stated that both are being treated

medically and it "does not meet or equal any listing, and the (previous) symptoms do not

preclude work at any level of exertion." R. 299.

8

On January 12, 2000, Dr. Richard Weiskopf evaluated Plaintiff and opined that she had "no limitations regarding sitting, standing, walking or carrying," but that Plaintiff "has moderate limitation with lifting because of abdominal pain." R. 402. Furthermore, Dr. Weiskopf noted that Plaintiff "has good use of her hands regarding fine motor activity and strength of hand muscles." R. 402.

Dr. Richard B. Weiss completed a physical RFC for Plaintiff on February 14, 2000. R. 407. He opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten; she could stand, walk, or sit for about six hours in a normal eight hour workday; and that she has no push/pull limitations. These were the only areas in which he marked limitations. R. 408. On May 24, 2000, Dr. Weiss also completed a psychiatric review technique, and opined that Plaintiff's impairments are not severe. R. 419.

In an undated physical RFC, Dr. Alberto DelPino acknowledged Plaintiff's abdominal pain and constipation, but opined that Plaintiff had no limitations on her ability to do work-related physical activities. R. 415-18. Disability Analyst II, Rose Thorton, completed a physical RFC for Plaintiff on May 2, 2001. R. 464. She noted that Plaintiff could occasionally lift twenty pounds, and frequently ten; she could stand, walk, or sit for about six hours in an eight-hour workday, and had an unlimited push/pull ability. R. 465. Additionally, she noted that due to mild carpal tunnel syndrome, Plaintiff's fingering (fine manipulation) ability is limited. R. 467.

Dr. D'Ambrocia completed a mental RFC for Plaintiff on March 21, 2002. R. 566. The psychiatric review technique he completed recorded that Plaintiff had major depression,

9

borderline personality disorder, and abused cannabis, all of which he remarked constitute "[a] medically determinable impairment that does not precisely satisfy the diagnostic criteria above." R. 555, 559-60. Dr. D'Ambrocia further opined that the conditions would create "mild" "restriction of activities of daily living" and "difficulties in maintaining concentration, persistence, or pace," and "moderate" limitations resulting in "difficulties in maintaining social functioning." R. 562. Additionally, he opined that there were one or two "episodes of decompensation, each of extended duration." R. 562.

Dr. D'Ambrocia also indicated, in a mental RFC assessment completed on the same date, that Plaintiff was "not significantly limited" in all but three areas, where he marked that she was "moderately limited": "[t]he ability to maintain attention and concentration for extended periods," "[t]he ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness," and "[t]he ability to respond appropriately to changes in the work setting." R. 566-67. Furthermore, Dr. D'Ambrocia noted that "based on [the] four cognitive limitations the [Plaintiff] is viewed as able to understand and remember instructions, sustain [attention]/concentration for tasks, related adequately [with] others, and adopt to simple tasks." R. 569.

On April 9, 2002, a physical RFC was completed for Plaintiff. R. 570. Plaintiff was noted as having exertional limitations of being "occasionally" able to lift and/or carry fifty pounds, "frequently" able to do so for twenty-five pounds, and as being able to stand, walk, or sit for about six hours in an eight-hour workday. R. 571. Additionally, Plaintiff was noted as having no limits on her push and pull ability. R. 571.

10

Dr. Pavelock sent a correspondence to Plaintiff's attorney dated September 9, 2003, where he remarked that Plaintiff "physically is probably able to carry out simpler jobs from a physical and mental standpoint . . . ." R. 578. However, "given her chronic abdominal pain and depression, it would be extremely unlikely for her to be able to perform any type of complex tasks that require her attention for a prolonged period of time." R. 578. He further opined that "given her abdominal pain and the need for a restroom, I think it would be extremely difficult for her to be stationary at a given job." R. 578. There is no RFC from Dr. Pavelock on the record.

### E. The Hearing

During the first hearing on June 25, 2003, the ALJ inquired of Plaintiff as to her *pro se* status and asked if she wanted to waive her right to representation. R. 622. Plaintiff stated she was without representation because she was did not know how to retain one and was unsure of the process. R. 622. After learning Plaintiff was currently employed, the ALJ explained the Social Security standard in depth to Plaintiff. R. 622-24. The ALJ provided a representation contact sheet to Plaintiff, and, after Plaintiff agreed she wanted to retain representation, the ALJ stated that he would issue another notice of hearing for her. R. 628, 632-34.

At her second hearing on September 2, 2003, Plaintiff, now with representation, testified that she had graduated from high school and attended college for about a year, but currently was not enrolled. R. 638, 640. She further testified that she lives at her parents' house with her two brothers and previously lived with her boyfriend until February 2002. R. 641-42. Plaintiff stated that she had been fired from her full-time job two months prior in July for not providing proof of her absences. R. 640-41. She testified that she had to "get [her] esophagus stretched"

11

and that her GI doctor had taken her out of work. R. 642. Plaintiff alleged that when she submitted the medical slips permitting her return to work, her employer did not accept it and fired her on the spot, alleging "that [Plaintiff] never showed them any proof of [her] recurring absences." R. 642. However, Plaintiff alleged she had all the medical slips and attempted to present them. R. 642.

Plaintiff testified that she had been submitting applications for work and had one interview; however, after explaining that her abdominal problems are why she had not held jobs for very long, employers had not hired her. R. 643. Further, Plaintiff described her symptoms as nausea, feeling lightheaded, and dizzy, which could have been exacerbated by her previous employment because it required a lot of lifting and bending. R. 643. Additionally, she noted that one of her conditions deteriorated the lining of her esophagus, which requires an endoscopy every six months. R. 644.

Plaintiff also noted that her life has changed after losing her job and stated that she does not do much of anything. R. 644. She testified that it had been four weeks since she filed for unemployment, but that she was repeatedly told to call back at the start of the next week. R. 644. At the conclusion of the hearing, the ALJ stated that he would hold the record open under October 3, and would be glad to grant further continuances for timely requests. Plaintiff called forth no other witnesses, nor did the ALJ call a vocational or medical expert.

## III. LEGAL STANDARD

### A. Standard of Review

District courts have jurisdiction to review claims contesting a final decision by the Commission of Social Security denying disability benefits. 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3). In reviewing any such claim, a district court may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, it must defer to the Commissioner's determination unless the correct legal standards were not applied or substantial evidence in the record does not support the determination. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

Even where substantial evidence supports an ALJ's conclusion, if "there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Id. Likewise, a reviewing court should remand any case where an ALJ fails to set forth with sufficient specificity the crucial factors underlying a determination such that the court is able to decide whether that determination is supported by substantial evidence. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); see also Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982) (remand is appropriate where a reviewing court is "unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required").

"Substantial evidence" requires more than a mere scintilla of evidence, yet less than a preponderance. Sanchez v. NLRB, 785 F.2d 409 (2d Cir. 1986). It has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

13

Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (citation omitted); Ryan v. Astrue, 650 F. Supp. 2d 207, 216 (N.D.N.Y. 2009). Where evidence is susceptible to more than one rational interpretation, a court may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984) (citation omitted).

A district court has the authority to affirm, reverse, or modify a final decision of the Commissioner with or without remand. 42 U.S.C. § 405(g). Granting judgment on the pleadings is appropriate where the material facts are undisputed and where a court may make a judgment on the merits with reference only to the contents of the pleadings. FED. R. CIV. P. 12(c); Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639 (2d Cir. 1988). However, remand is warranted where there are gaps in the record and further development of the evidence is needed, or where the ALJ has applied an improper legal standard. See Butts, 388 F.3d at 385; Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999); Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).

Remand is most appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (citation omitted). Additionally, remand is appropriate to allow for the consideration of additional new

14

evidence that is material to the case where there is new evidence that it is material and good cause exists for the failure to submit that evidence in prior proceedings. Melkonyan v. Sullivan, 501 U.S. 89 (1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983).  By contrast, reversal and remand solely for calculation of benefits is appropriate when there is "persuasive proof of disability" and further development of the record would not serve any purpose. Rosa, 168 F.3d at 83; Parker, 626 F.2d at 235; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 644 (2d Cir. 1983).

### B.  Benefits Eligibility

Under the Social Security Act, an individual is disabled if he is unable "to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  The Social Security Administration ("SSA") uses a five-step sequential evaluation process to determine whether a claimant over the age of 18 is disabled under the Social Security Act.  See 20 C.F.R. §§ 416.920, 404.1520; see also Bowen v. Yuckert, 482 U.S. 137 (1987) (upholding the validity of this evaluation process); Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 200) (citing DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998)).  "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  The plaintiff bears the burden of proof for the first four steps, and the Commissioner bears that burden in step five.  See Bowen, 482 U.S. at 146; Shaw, 221 F.3d at

15

132.

20 C.F.R. § 404.1520 details the SSA's five-step analysis.  At step one, the ALJ

considers whether the claimant is currently engaged in substantial gainful activity.1  If the

claimant is not engaged in such activity, the ALJ advances to step two of the analysis and

considers whether the claimant has a severe impairment meeting the "durational requirement"2

and significantly limiting her physical or mental ability to perform basic work activities.  In

making this determination, the ALJ does not consider the claimant's age, education, or work

experience.  Assuming the ALJ finds that the claimant has a severe impairments, the ALJ

continues to step three and determines whether the impairment(s) meet or equal any of those

listed in Appendix 1, Subpart P of Regulation No. 4 ("the Listings").  If the ALJ concludes that

the claimant's impairment(s) do meet or equal one or more of the Listings, the claimant is

deemed disabled.  If the claimant's impairment(s) do not meet or equal one of the Listings, the

fourth step of the evaluation requires the ALJ to assess whether, despite the claimant's severe

impairment(s), the claimant's residual functional capacity ("RFC") allows him to perform his

past work.

If the claimant is unable to perform her past work, the fifth step in the sequential analysis

---

[1] 20 C.F.R. § 404.1572(a) defines "substantial work activity" as "work activity that involves doing significant physical or mental activities."  20 C.F.R. § 404.1572(b) defines "gainful work activity" as "the kind of work usually done for pay or profit."

[2] Under the "durational requirement," the impairment must either be expected to result in death or must last for, or be expected to last for, a continuous period of at least 12 months.  20 C.F.R. § 404.1509.

16

is a two-part process that requires the ALJ to first assess the claimant's job qualifications by

considering her physical ability, age, education, and work experience, and then determine

whether jobs exist in the national economy that she could perform.  See 42 U.S.C. §

423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler, 461 U.S. 458, 460 (1983).  Where a claimant

only suffers from exertional impairments, the grids are conclusive of the existence of a

disability; where, however, "a claimant suffers from additional 'nonexertional' impairments, the

grid rules may not be controlling."  Heckler at 605.


## IV. DISCUSSION

### A. The Commissioner's Decision

Following the hearings, the ALJ made the following determinations on December 8,

2003, which the Commissioner subsequently adopted as his final decision:

(1) The claimant meets the non-disability requirements for a period of disability and
Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured
for benefits through June 30, 2002, but may have been extended due to continuing work activity
through June, 2003.

(2) The claimant meets the non-disability requirements for Childhood Disability Benefits
set forth in Section 202(d) of the Social Security Act.

(3) The claimant engaged in substantial gainful activity during the periods April-
November 2002 and December 2002 to July 2003.

(4) The claimant has an impairment or a combination of impairments considered
"severe" based on the requirements in the Regulations 20 C.F.R. 404.1520(b) and 416.920(b).

(5) These medically determinable impairments do not meet or medically equal one of the

17

listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(6) The claimant's allegations regarding her limitations are not credible.

(7) The claimant has the residual functional capacity to perform the full range of light work. The claimant has failed to satisfy her burden of establishing that she has any significant limitations on her mental residual functional capacity.

(8) That claimant's past relevant work as deli worker, assembly line worker and cashier did not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. 404.1565 and 416.965).

(9) The claimant's medically determinable abdominal enteritis and depression do not prevent the claimant from performing her past relevant work.

(10) The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. 404.1520(e) and 416.920(e)).
R. 27-28.

**B. Five-Step Analysis**

**1. Substantial Gainful Activity**

Step one of the five-step analysis requires the ALJ to consider "whether the claimant is currently engaged in substantial gainful activity." 20 C.F.R. § 404.1520. The ALJ found that Plaintiff has engaged in substantial gainful employment "for the period April-November and December 2002 to July 2003," and concluded that "[s]he is therefore not eligible for a period of disability, disability insurance benefits or supplemental security income during these periods." R. 20.

**2. Severity of Impairment**

If a claimant is not engaged in substantial gainful activity, the ALJ must next consider

18

whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activity. 20 C.F.R. § 404.1520. The ALJ determined that Plaintiff's arthritis of the ribs, carpal tunnel syndrome, and mental impairment are not "severe" within the meaning of the regulations. R. 22-24. Further, the ALJ determined that Plaintiff's abdominal enteritis is a "severe" impairment within the Regulations. R. 24.

### 3. Listed Impairment

If the claimant is not performing substantial gainful work and has a "severe impairment," the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in the Listings. 20 C.F.R. § 404.1520. Notwithstanding the ALJ's determination that Plaintiff's abdominal enteritis was "severe" within the meaning of the Regulations, the ALJ concluded that it was "not 'severe' enough to meet or medically equal one of the impairments" found in the Listings. R. 24.

### 4. Past Relevant Work

If the Plaintiff's impairment does not correspond to one of the Listings, the fourth step is to inquire whether, despite the Plaintiff's severe impairment, she has the RFC to perform her past work. 20 C.F.R. § 404.1520. The ALJ concluded that "based on her established residual functional capacity for medium work, the claimant is able to perform all of her past relevant work." R. 27. Under the ALJ's "Findings," he further concluded that Plaintiff "has the residual functional capacity to perform the full range of light work," and also noted that Plaintiff "has failed to satisfy her burden of establishing that she has any significant limitations on her mental

19

residual functional capacity." R. 28. Plaintiff was terminated 2 months prior to the hearing "for reasons other than her alleged impairments" from her last job. R. 27; 640, 642-43.

As defined by 20 C.F.R. § 404.1567 and 416.967, the ALJ found that Plaintiff's "past relevant work as deli worker, assembly line worker and cashier did not require the performance of work-related activities precluded by her residual functional capacity." R. 28. First, the dictionary of occupational titles defines the job of deli worker as medium work, and that of cashier as light work. Dictionary of Occupational Titles ("DOT") at 317.644-010; 21.462-014. Furthermore, her "medically determinable abdominal enteritis and depression do not prevent the claimant from performing her past relevant work." R. 28.

### C. Plaintiff's Objections to the ALJ's Decision

Plaintiff argues that reversal, or in the alternative, remand, is appropriate because, in reaching the determination that Plaintiff is not "disabled" under the Act, the ALJ erred in failing to accord sufficient weight to Dr. Pavelock's treating physician opinions. Plaintiff further argues that the ALJ's determination that Plaintiff is capable of performing the full range of light work is not supported by substantial evidence in the record. Pl. Br. at 12. Cumulatively, Plaintiff alleges, these errors resulted in the ALJ's unsupported and wrongful determination that Plaintiff is capable of performing her past relevant work. Pl. Br. at 12. The Court finds that it has no jurisdiction to review the Commissioner's denial of disability benefits on the basis of *res judicata* for the period prior to May 8, 2001, and that the ALJ properly concluded that Plaintiff engaged in substantial gainful activity from April 2002 to November 2002, and from December

2002 to July 2003.  The Court also finds that the ALJ did not improperly weigh the opinion of

Plaintiff's treating GI physician, Dr. Pavelock, and that the ALJ's determination that Plaintiff

retained the RFC to perform the full range of light work was supported by substantial evidence.

### 1. The Court has No Jurisdiction to Review the Commissioner's Denial of Disability Benefits Prior to May 8, 2001 on the Basis of *Res Judicata*

The regulations provide that the Commissioner may dismiss a hearing request and

decline to issue a "final decision" if:

> [t]he doctrine of res judicata applies in that we have made a previous
> determination or decision under this subpart about your rights on the
> same facts and on the same issue or issues, and this previous
> determination or decision has become final by either administrative or judicial action.

20 C.F.R. § 404.957(c).

See also Malave v. Sullivan, 777 F. Supp. 247, 251 (S.D.N.Y. 1991).  The doctrine of

administrative *res judicata* was sanctioned by the Supreme Court in United States v. Utah

Construction & Mining Co., 384 U.S. 394, 422 (1966), in which it stated that "[w]hen an

administrative agency is acting in a judicial capacity and resolves disputed issues of fact

properly before it which the parties have had an adequate opportunity to litigate, the courts have

not hesitated to apply res judicata to enforce repose."

In this case, Plaintiff's current application for benefits for the period of time prior to May

8, 2001 is a duplicate of her December 1999 and January 2001 applications, as they both present

essentially the same impairments and medical evidence.  Plaintiff's prior applications were

administratively denied through May 8, 2001, and Plaintiff sought no further appeal.  See R. 19,

21

30- 33, 41-45, 48-56, 90-92.  Accordingly, the ALJ properly declined to consider, on the grounds

of *res judicata*, Plaintiff's January 2002 application for benefits for the period of time prior to

May 8, 2001.

Courts in the Second Circuit, in extending the rationale of <u>Califano v. Sanders</u>, have held

that a district court has no jurisdiction to review the Commissioner's *res judicata* determinations

unless a colorable constitutional violation has been alleged.  <u>Anato v. Bowen</u>, 739 F. Supp. 108

(E.D.N.Y. 1990); <u>Malave</u>, 777 F. Supp. at 251; <u>see also</u> <u>Latona v. Schweiker</u>, 707 F.2d 79 (2d

Cir. 1983); <u>Willow v. Sullivan</u>, 733 F. Supp. 591 (W.D.N.Y. 1990).  In this case, Plaintiff has

not alleged a colorable constitutional claim.  Indeed, Plaintiff has not challenged the ALJ's

finding that *res judicata* precluded consideration of the period prior to May 8, 2001.  <u>See</u> Pl. Br.

Accordingly, the Court finds that it has no jurisdiction to review the Commissioner's denial of

disability benefits on the basis of *res judicata*.

### 2. The ALJ Properly Concluded that Plaintiff Engaged in Substantial Gainful Activity from April 2002 to November 2002, and December 2002 to July 2003.

Under the sequential evaluation, if a claimant is engaging in substantial gainful activity

("SGA"), she will be found not disabled.  20 C.F.R. §§ 404.1520(a)(I), 416.920(a)(I).  The

regulations provide a formula for determining whether an individual has or has not engaged in

SGA in any given calendar year.  <u>See</u> 20 C.F.R. §§ 404.1574(b)(2)(ii) and (3); 416.974(b)(2)(ii)

and (3).  Monthly earnings that averaged more than $780.00 in 2002 and $800.00 in 2003

constitute SGA.  See id.; R. 20.

In the instant case, the record demonstrates that plaintiff engaged in SGA from April 5, 2002 to November 5, 2002, and from December 2002 to July 2003.  R. 20; R. 97, 229 (earning $6,715.28 for these seven months); see R. 229, 641 (testifying that she worked full-time from December 2002 to July 2003 and earned $7.48 per hour).  Accordingly, Plaintiff could not be found disabled during these time periods.  Plaintiff has not challenged the ALJ's conclusion that she engaged in SGA for these periods.  See Pl. Br.  Accordingly, the ALJ's conclusion that Plaintiff was not disabled from April 2002 to November 2002, and from December 2002 to July 2003, is supported by substantial evidence and should be affirmed.

### 3. The ALJ Did Not Improperly Weigh the Opinions of Plaintiff's Treating Physician

Plaintiff challenges the ALJ's decision to assign "little weight" to the opinion of Plaintiff's treating GI physician, Dr. Pavelock, as that is a decision that may have impacted the determination at steps two, three, and four.  After reviewing 20 C.F.R. §§ 404.1527, 416.927, and SRR 96-6p, the ALJ found that, "[w]ith the exception of Dr. Pavelock, all of the medical assessments and opinions of record consistently indicate that [Plaintiff] is not disabled by her physical impairments."  R. 26.  The ALJ concluded that Dr. Pavelock's "opinion that [Plaintiff] cannot perform complex tasks because of poor attention is not supported on this record."  R. 26.  Moreover, Plaintiff's psychiatrist, Dr. Shapiro, failed to "find any attention deficits during two consultative psychiatric evaluations" while Plaintiff attended nursing college and worked from

23

2002 to 2003.  R. 26.  The ALJ noted that Dr. Pavelock's opinions "are outside the scope of his specialization in digestive diseases," and concluded that Dr. Shapiro's "pronouncements as to the [Plaintiff's] mental functioning are entitled to more weight than the comments of a non-specialist like Dr. Pavelock."  R. 26.  While the ALJ gave considerable weight to the various assessments, other than Dr. Pavelock, the ALJ still provided Dr. Pavelock's opinion "some weight . . . to the extent that he indicates that the claimant can perform the physical tasks of simple work."  R. 26.

Under the Commissioner's regulations, the opinion of a treating source on the nature and severity of a claimant's impairment is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence.  20 C.F.R. §§ 404.1527(d); 416.927(d); see Schisler v. Sullivan, 3 F.3d 563 (2d Cir. 1993).  See also, SSR 96-2p (controlling weight may not be given to a treating source's medical opinion if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and is "not inconsistent" with the other substantial evidence in the case record).  Indeed, the Commissioner's regulations explicitly state that the Commissioner will "[g]enerally . . . give more weight to opinions from . . . treating sources."  20 C.F.R. § 404.1527(d)(2).  However, if the opinion of a treating source is not well-supported or consistent with other evidence, the Commissioner must consider several factors, such as the examining relationship, treatment relationship, supportability given to the opinion, consistency of the opinion with the record as a whole, specialization of the physician, and other factors raised by a

24

petitioner, in order to decide whether to accord the treating source's opinion more weight. 20 C.F.R. 416.927(d).

If the Commissioner shows that a treating source's opinion is not well-supported or inconsistent with the record, the regulations "permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record." Diaz v. Shalala, 59 F.3d 307 (2d Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)). Indeed, "[it] is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of Social Security disability." Dunn v. Comm'r of Soc. Sec., 2010 U.S. Dist. LEXIS 136484 (N.D.N.Y. November 18, 2010); see also 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), 416.927(f)(2). Thus, in this case, the ALJ was permitted to use the opinions of non-treating physicians and state agency file reviewers to override Plaintiff's treating physician, so long as those medical opinions were supported by evidence in the record.

Plaintiff claims in her brief that the ALJ gave greater weight to other non-treating physician's opinion than to Dr. Pavelock's opinion, and that this was improper because Dr. Pavelock is Plaintiff's treating physician who had treated her from September 1999 until present. Pl. Br. at 9. Further, Plaintiff purports that Dr. Weiskopf's diagnosis of chronic depression supports Dr. Pavelock's opinion that the Plaintiff's depression would affect her ability to work. Pl. Br. at 9.

25

The Court begins by noting that Plaintiff mischaracterizes Dr. Weikopf's diagnosis of Plaintiff. While Plaintiff is correct that Dr. Weiskopf listed Plaintiff under the diagnosis of "Chronic depression," it does not appear that Dr. Weiskopf actively diagnosed her with this condition. Instead, Dr. Weiskopf was noting depression as a part of her medical history. Pl. Br. at 9; R. 401. Plaintiff further mischaracterizes the report by Dr. Weiskopf as having conducted any psychological or emotional testing. R. 399. Dr. Weiskopf, a non-treating physician who, as the record indicates, saw the Plaintiff only once, noted that Plaintiff "has a history of depression." R. 399.  However, in his evaluation on January 12, 2000, he did not conduct any "medically acceptable clinical and laboratory diagnostic techniques" regarding Plaintiff's mental state, but merely conducted a physical examination. R. 399; SSR 96-2p.  This is further evidenced by Dr. Weiskopf's closing "Medical Source Statement," which pertained solely to physical limitations. R. 402.  Dr. Weiskopf offered no opinion on how Plaintiff's diagnosis of "Chronic depression" limits her functioning, but merely repeated it. R. 401.

Plaintiff is therefore left with only the opinion of Dr. Pavelock, a treating GI physician who submitted a letter in which he stated that she was "probably able to carry out simpler jobs from a physical and mental standpoint," but was "extremely unlikely" to perform complex tasks for a prolonged period, or remain stationary at a given job. R. 578. Dr. Pavelock is a qualified GI doctor who saw Plaintiff frequently over a span of four years, during which he examined and monitored her medical condition, provided medical advice and opinions, and treated her symptoms with various medications. Pl. Br. at 9.  Dr. Pavelock's physical evaluations of

26

Plaintiff have not been drastically inconsistent with the various other opinions in the record. On February 9, 1999, he found that Plaintiff had "mild gastritis" and opined that she had an "apparent malrotation of the gut," both of which are consistent with the record. R. 371, 378. In December 2001, he noted that her condition had "much improved" after prescribing new medication for her, even though he noted that "she needed to be watched very closely." R. 473. These observations regarding Plaintiff's physical condition are consistent with the record.

However, the ALJ found that Dr. Pavelock's submissions regarding Plaintiff's physical and mental limitations are inconsistent with the record, and the Court finds that this decision is supported by substantial evidence. For example, Dr. Pavelock submitted a letter regarding Plaintiff's physical limitations, in which he noted that "although she physically is probably able to carry out simpler jobs from a physical and mental standpoint, given her chronic abdominal pain . . . . and the need for a restroom, I think it would be extremely difficult for her to be stationary at a given job." R. 578. This letter is inconsistent with all the physical RFCs on the record, including those of Dr. Finley (R. 292-99), Dr. Weiss (R. 407), Dr. Del Pino (R. 415), Disability Analyst II Rose Thorton (R. 464), and a state medical consultant's RFC (R. 570). These five physical RFCs all similarly opined that Plaintiff had no limitations or a mild limitation, that she could "occasionally" lift at least twenty pounds, "frequently" at least ten, and that she could stand, walk, or sit for "about 6 hours in an 9-hour workday." R. 292-99, 407, 415, 464, 570.

Furthermore, Dr. Pavelock's opinion in the letter is inconsistent with the end-of-session

27

evaluations by Plaintiff's PTs.  Plaintiff began physical therapy in February 2002, and after approximately nine weeks of performing various physical exercises like trunk rotations, body weight squats, seated rows, leg press, lat pull-downs, abdominal curls, and back extensions, coupled with light treadmill or recumbent bicycle exertion, Plaintiff only had "minimal complaints of pain and difficulty," and sometimes had no complaints whatsoever.  R. 526, 528, 530, 532, 534, 536, 538, 543, 547, 549, 551.  These evaluations substantiate the other various objective physical medical evaluations that are inconsistent with Dr. Pavelock's physical opinion of Plaintiff's physical abilities.

Additionally, Dr. Pavelock's letter opined that "it would be extremely unlikely for [Plaintiff] to be able to perform any type of complex tasks that require her attention for a prolonged period of time." R. 578.  This was not supported in the record by any "medically acceptable clinical and laboratory diagnostic techniques," but merely submitted in a letter to Plaintiff's attorney as an opinion.  See SSR 96-2p.  Dr. Pavelock's letter took purported to take into account both Plaintiff's physical and mental conditions in reaching this opinion  R. 578.

However, Dr. Shapiro, a psychiatrist who twice consulted with Plaintiff, opined the first time that her symptoms of depression were "mild in nature," and both times concluded that there would not appear to be any negative impingements on Plaintiff's ability to work.  R. 405-06; 448-49.  Two weeks after Dr. Shapiro's second evaluation of Plaintiff, Dr. A. Hameid, a non-treating physician, performed a psychiatric review technique and concluded that Plaintiff had "no medically determinable Impairments." R. 450.  Approximately five weeks after Dr. A.

28

Hameid's evaluation, Dr. Weiss also conducted a psychiatric review technique and concluded that Plaintiff's "impairment(s) [were] not severe." R. 419.

On March 21, 2002, Dr. D'Ambrocia's mental RFC did agree partially with Dr. Pavelock that Plaintiff was "moderately limited" in her "ability to maintain attention and concentration for extended periods of time." R. 566-69.  However, this RFC noted that Plaintiff was "not significantly limited" in her "ability to carry out detailed instructions" and that she is still able to "remember instructions [and] sustain [attention]/concentration for tasks." R. 566-69. Furthermore, Dr. D'Ambrocia did not note that Plaintiff was "markedly limited," which would be consistent with Dr. Pavelock's opinion that Plaintiff is "extremely unlikely" to perform complex mental tasks requiring her attention for a prolonged period of time. R. 566, 578. In summary, Dr. Shapiro, Dr. Hameid, Dr. Weiss, and Dr. D'Ambrocia submitted opinions inconsistent with Dr. Pavelock's letter.

Therefore, the ALJ was confronted with the opinion of Dr. Pavelock, whose assessment of Plaintiff's mental limitations contradicted multiple other assessments.  The ALJ discounted Dr. Pavelock's opinion and decided not to give it controlling weight because it was not supported by the record. R. 405-06.  Additionally, Plaintiff had displayed an ability to perform the very tasks Dr. Pavelock opined she was incapable of performing: She recently went through the rigors of nursing school for one year and held employment, including both part-time and full-time work. R. 26.  Therefore, the ALJ accorded the most weight to Dr. Shapiro's opinion, because it was the opinion that was consistent with Dr. A. Hameid, Dr. Weiss, and the other

29

objective evidence on the record. R. 450.

The Court finds that substantial evidence supports the ALJ's findings that Dr. Pavelock's medical opinion should be discounted and Dr. Shapiro's opinion should be accorded the most weight in determining Plaintiff's mental limitations. First, as the ALJ noted, Dr. Pavelock's opinion is the exception to the record, which contains medical assessments and opinions consistently indicating that Plaintiff is not disabled by her physical impairment. R. 26; see also 20 C.F.R. §416.927(d)(4) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Second, while there is no question that Dr. Pavelock is a qualified physician with a speciality in digestive diseases and disorders, Dr. Shapiro is also a qualified psychiatrist who specializes in cognitive functioning and mental evaluation. Therefore, the ALJ properly deferred to the knowledge of Dr. Shapiro and her evaluations of Plaintiff's cognitive functioning as they lie in her area of speciality, and are additionally supported by Dr. A. Hamied and Dr. Weiss' follow-up examinations. 20 C.F.R. §416.927(d)(5) ("generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

And third, Dr. Weiskopf's opinion was not one deduced after any emotional, mental, or psychological testing, but was merely a repetition of past diagnoses. R. 401. Further, Dr. Weiskopf offers no opinion on the diagnosis' ability to affect Plaintiff's ability to work, and

merely serves as a repetition of the diagnoses previously noted.  R. 402; 20 C.F.R. §§

404.1527(d); 416.927(d)  (providing that the opinion of a treating source on the nature and

severity of a claimant's impairment is given controlling weight if it is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

other substantial evidence); Schisler v. Sullivan, 3 F.3d 563 (2d Cir. 1993); SSR 96-2p

(controlling weight may not be given to a treating source's medical opinion if it is not well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is "not

inconsistent" with the other substantial evidence in the case record).

The Court finds that the ALJ's determinations regarding the weight that should be

accorded to the opinions of Plaintiff's treating physician, Dr. Pavelock, and the opinion of Dr.

Shapiro, are supported by substantial evidence in the record.

### 4. The ALJ's Determination that Plaintiff Retained the Residual Functional Capacity to Perform the Full Range of Light Work Was Supported by Substantial Evidence

In completing step four of the sequential evaluation process, the ALJ found that Plaintiff

could perform her past relevant work as a deli worker, assembly line worker, and cashier

because her residual functional capacity allowed her to "perform the full range of light work."

R. 28.  Plaintiff claims that this determination by the ALJ is not supported by substantial

evidence in the record.  Pl. Br. at 11.  Specifically, Plaintiff contends that in her past relevant

work she had a lifting limitation of five pounds, and that she has suffered from depression and

31

"does not have the mental ability to perform a full range of light work." Pl. Br. at 11.  Plaintiff

further alleges that she does not have the ability to concentrate for extended periods of time, and

that if "the record properly developed and the physical and mental limitations noted by Dr.

Pavelock credited, it is submitted that there would be no range of light work that the Plaintiff

could perform in large numbers in the economy." Pl. Br. at 11.

Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or

carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b); 20 C.F.R. §

416.967(b).  Furthermore, a finding of light work, by definition, does not encompass the entire

range of light work defined in 20 C.F.R. §§ 404.1567(b), 416.967(b).  See, e.g., Legg v. Astrue,

Case No. 06-CV-0167, 2008 WL 2323403 (N.D.N.Y. June 2, 2008) (permitting a finding of light

work even though "Plaintiff's additional limitations do not allow her to perform the full range of

light work. . . .").  Moreover, a Plaintiff's "RFC is not the least an individual can do despite his

or her limitations or restrictions, but the most." SSR 96-8p.

SSR 96-8p also requires the Commissioner to first "identify the individual's functional

limitations or restrictions and assess his or her work-related abilities on a function-by-function

basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and

416.945." These sections provide for the evaluation of a claimant's physical abilities, such as

sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (like

reaching, handling, stooping, crouching), mental abilities such as limitations in one's ability to

understand, remember, carry out instructions, respond appropriately to supervision, coworkers,

and work pressures in a work setting, and other abilities that are affected by impairments such as skin impairments, epilepsy, vision or hearing impairments that could impose environmental restrictions. 20 C.F.R. §§ 404.1545(b)-(d); 416.945(b)-(d). Only then may a residual functioning capacity be expressed in terms of exertional levels of work. Broadbeck v. Astrue, Case No. 5:05-CV-0257, 2008 WL 681905 (N.D.N.Y. March 7, 2008).

The ALJ reached his determination that Plaintiff is capable of performing such work after reviewing the record in its entirety and performing a function-by-function analysis. R. 26. Once the ALJ concluded that Dr. Pavelock's opinion is the exception to the medical record and inconsistent with the vast majority of medical evidence, he discounted it. R. 26. The ALJ assessed each of Plaintiff's medical conditions separately via medical evidence supplied from the record: tailbone pain (R. 21), lower back pain (R. 21), malrotation of the small bowel (R. 22), arthritis of the ribs (R. 22), carpal tunnel syndrome (R. 22), and psychiatric impairment (R. 23).

As the Court concluded above, the ALJ properly discounted Dr. Pavelock's opinion regarding Plaintiff's mental limitations. Given that Dr. Pavelock's assessment was the only opinion in the record that supported her claim of having significant limitations of her mental residual functional capacity, the ALJ's conclusion that Plaintiff had "failed to satisfy her burden of establishing that she ha[d] any significant limitations on her mental residual functional capacity" was supported by substantial evidence.

With respect to Plaintiff's physical limitations, the ALJ assessed the various evaluations and opinions in the record, and gave some weight to Dr. Pavelock's opinion that Plaintiff can

perform the physical tasks of simple work. R. 26. The ALJ also reviewed several RCFs: a state

agency disability analyst concluded on April 19, 2002, that Plaintiff can perform the full range of

medium work; another state agency disability analyst concluded that Plaintiff can perform a full

range of light work; and a state agency program physician concluded that Plaintiff can perform a

full range of light work. R. 26. In his decision, the ALJ initially concluded that the Plaintiff's

abilities "are consistent with the ability to work the full range of medium work." R. 27. It is

unclear to the Court how the ALJ deduced that Plaintiff retained the ability to perform medium

work from the majority of record.

However, in his conclusions, the ALJ adopted the RFC that was most favorable to

Plaintiff, which found that Plaintiff had the ability to perform the "full range of light work." R.

28. Indeed, the ALJ's finding that Plaintiff could occasionally lift at least twenty pounds,

frequently at least ten pounds, and that she should stand, walk, or sit for "about 6 hours in an 8-

hour workday" is consistent with the minimum limitations provided in all of the RFCs in the

record. R. 28, 292-99, 407, 415, 464, 570. These limitations are akin to the maximum amount

provided for in the definition of "light work." 20 C.F.R. § 404.1567(b); 20 C.F.R. § 416.967(b)

(defining light work as "lifting no more than 20 pounds at a time with frequent lifting or carrying

of objects weighing up to 10 pounds."); SSR 96-8p (noting that an RFC is not the least an

individual can do, but the most; therefore, if Plaintiff's ability is consistent with medium work,

she could perform light work and sedentary work). After reviewing the ALJ's opinion, it is clear

to the Court that the ALJ's conclusion fits within the enumerated factors of paragraphs (b), (c),

34

and (d) of 20 C.F.R. §§ 404.1545 and 416.945.  Therefore, this Court will affirm the ALJ's findings.


**V. CONCLUSION**

Accordingly, it is hereby:

> **ORDERED**, that Plaintiff's Motion for judgment on the pleadings (Dkt. No. 9) is **DENIED**; and it is further

> **ORDERED**, that Defendant's Motion for judgment on the pleadings (Dkt. No. 10) is **GRANTED**; and it is further

> **ORDERED**, that the Commissioner's determination of no disability is **AFFIRMED**; and it is further

> **ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED**.


DATED:       June 07, 2011
             Albany, New York


Lawrence E. Kahn
U.S. District Judge

35